1    WO

6    **IN THE UNITED STATES DISTRICT COURT**

7    **FOR THE DISTRICT OF ARIZONA**

9    Antonio Perez Martinez,                    No. CV-17-0089-PHX-DMF

10                        Plaintiff,
                                                 **MEMORANDUM AND ORDER**
11   v.

12   Commissioner of Social Security
     Administration,
13
                              Defendant.
14

16          Plaintiff Antonio Perez Martinez ("Claimant") appeals the Commissioner of the

17   Social Security Administration's decision to adopt Administrative Law Judge Ted

18   Armbruster's (ALJ's) ruling denying his applications for Disability Insurance Benefits

19   and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

20   Act. (Doc. 7 at 2)[1] Claimant argues that the ALJ erred by improperly: (1) finding that

21   Claimant could perform his past job "as generally performed"; (2) finding that Claimant

22   did not suffer from a "severe" impairment or a combination of impairments that is

23   "severe" in Step 2 of the sequential analysis; and (3) making a deficient credibility

24   assessment. (Doc. 22 at 1-2)

28          [1] Citations to "Doc." are to the Court's electronic docket under the above-
     captioned case number.

This Court has jurisdiction under 42 U.S.C. § 405(g) and subsequent to the parties' consent to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c). For the reasons set forth below, the Court will remand this matter.

## I. BACKGROUND

### A. Application and Social Security Administration Review

Claimant was 59 years old when he filed his applications for disability benefits and SSI in October 2012, alleging a disability onset date of August 6, 2012. (Doc. 18-6 at 2-16) Claimant alleged that the following mental and physical conditions limited his ability to work: depression, anxiety, anger problems, back problems, problems with sitting and standing, and hypertension. (Doc. 18-7 at 7) His applications were initially denied by the state agency on April 9, 2013 (Doc. 18-4 at 27) and again upon reconsideration on December 27, 2013 (*Id.* at 67). The ALJ conducted a hearing on Claimant's application on January 6, 2015. (Doc 18-3 at 46-85) The ALJ filed a notice of an unfavorable decision on May 11, 2015. (*Id.* at 20-37) Claimant requested review by the Appeals Council (*Id.* at 18), which was denied on December 11, 2015 (*Id.* at 2-6). At that point, the Commissioner's decision became final. *Brewes v. Comm'r of Soc. Sec. Admin.*, 682 F.3d 1157, 1162 (9th Cir. 2012).

### B. Relevant Medical Treatment

#### 1. *Shelly Myers, D.O., Fastmed Urgent Care*

On January 17, 2012, Claimant was seen by urgent care physician Shelly Myers, and presented with a right-sided headache after falling back off the lower steps of a ladder and hitting his head on a cinder block wall. (Doc. 18-8 at 3) Dr. Myers recorded that Claimant denied "anxiety/nerves, depression," and "joint pain, muscle pain." (*Id.*) After performing a general exam of Claimant, the doctor noted that Claimant had normal gait and posture, a supple neck and good range of motion, and normal psychiatric presentation. (*Id.* at 4) She also noted that Claimant would be "fit for duty" as of the next day. (*Id.*)

## 2. *Tammy McFadden, LPC and Banner Behavioral Health*

Tammy McFadden, a licensed professional counselor, signed a statement dated August 20, 2012, addressed to the Hartford Life and Accident Insurance Co. regarding Claimant and his claim for short-term disability. (Doc. 18-8 at 6) Ms. McFadden advised Hartford that Claimant was attending an "intensive out-patient mental health program" at Banner Behavioral Health-Chandler for three days a week, and for three hours each day. (*Id.*) She explained that the program was "at least" fifteen sessions, but could require up to twenty-four sessions depending on the individual's needs. (*Id.*) Ms. McFadden completed Claimant's discharge summary from the program. (*Id.* at 12) She described Claimant's condition upon presenting as involving "anxiety, depression, anger, medical, occupational, financial, isolation, limited support." (*Id.*) She noted that Claimant attended three sessions but had to withdraw after his insurance company denied his claim. (*Id.*) McFadden noted she had recommended that Claimant continue medication management with Dr. William Riley and also seek one-on-one therapy from a counselor. (*Id.*)

## 3. *Biltmore Healthcare and William Riley, M.D.*

Dr. William Riley saw Claimant from July 2 through October 11, 2012. (*Id.* at 15-30) Dr. Riley's specialization was in family practice. (*Id.* at 9) On July 2, 2012, Claimant presented to follow up on his Type 2 diabetes. (*Id.*) Dr. Riley's examination notes indicated that Claimant's neck was supple, with a full range of motion, and that he showed normal motor strength in his arms and legs. (*Id.*) Dr. Riley further indicated that a psychological exam found Claimant "alert, oriented, cognitive function intact, cooperative with exam, good eye contact, judgment and insight good, mood/affect full range, no auditory or visual hallucinations, speech clear, thought content without suicidal ideation, delusions, thought process logical, goal directed." (*Id.*) Claimant was also documented as denying painful joints or weakness. (*Id.* at 16)

On August 9, 2012, Claimant presented to Dr. Riley with new symptoms of anxiety and shaking. (*Id.* at 17) Dr. Riley quoted Claimant as saying he was very

nervous, that he was "dealing with [his] job again," he had been "written up," "came very close to doing something stupid," "might need some time off," and was "afraid to go back to work because someone might get hurt." (*Id.*) Dr. Riley's notes indicated that Claimant was "mildly verbally agitated," but "in no acute distress," exhibited "[t]ight bilat[eral] trapezei," was "alert and oriented," with a "grossly normal" cognitive exam, a normal gait, good insight and judgement, a full range of mood/affect, clear thought content without suicidal ideation, logical thought process, and that he was "agitated vaguely threatening towards others if he has to go back to work tomorrow but appropriately asking for time off." (*Id.* at 17-18) Dr. Riley documented that he prescribed new medications for anxiety, and recommended that Claimant see a psychiatrist to adjust his medications, a psychologist for counseling, and that he told Claimant he expected him to have scheduled an appointment with a psychiatrist before Dr. Riley saw him back in a week. (*Id.* at 18)

On August 17, 2012, Dr. Riley reported that Claimant had made an appointment with a psychiatrist for early September 2012, and that he had reported experiencing "one of the worst days with depression and anger." (*Id.* at 19) Dr. Riley saw Claimant again on August 27, 2012. The doctor indicated that once Claimant had seen a psychiatrist on September 10, 2012, Claimant could discuss any additional time needed off from work with the psychiatrist rather than with Riley. (*Id.*) Dr. Riley documented that Claimant told him he was experiencing trouble with concentration, mood swings, depression, sleeplessness, and fear of going back to work, "because he doesn't know what might set him off" if he did. (*Id.* at 21) The doctor observed that Claimant had an obvious "coarse tremor" when he held his hands out in front of him, but that the tremor was not obvious at rest or at any other time during the appointment. (*Id.* at 22)

Claimant next saw Dr. Riley on September 13, 2012. (*Id.* at 24) The doctor reported that Claimant told him he had attended his appointment with the psychiatrist, but that the psychiatrist told him not to return. (*Id.*) Dr. Riley was not able to reach the psychiatrist or gain access to her charts at that time. (*Id.*) The doctor noted that it

"[s]eems odd he would be told not to return to see [the psychiatrist]. [Claimant] was referred to anger [management] etc. and 2 more weeks will give him time to get set up. I am not really appreciating that the patient is disabled, just angry at his supervisor." (*Id.* at 25) Dr. Riley listed his current medications, which included prescriptions to treat high cholesterol, high blood pressure, anxiety, and depression. (*Id.* at 24)

Claimant was examined by Dr. Riley on September 27, 2012. (*Id.* at 27) The doctor reported having spoken to the psychiatrist Claimant saw earlier that month. (*Id.*) The psychiatrist said she thought Claimant had not been taking his depression medication regularly. (*Id.*) Claimant told Dr. Riley that he had not been taking his anxiety medication regularly, but that he was back on schedule. (*Id.*) The psychiatrist had advised Dr. Riley that Claimant was not a candidate patient for her practice because he did not want to be seen as frequently as she wanted to see him. (*Id.*) Riley noted that Claimant denied this. (*Id.*) Claimant told Dr. Riley that he still felt depressed, and that he was using a cane because his back hurt. (*Id.*) Dr. Riley characterized his impressions as follows:

> The patient is depressed, but this all seems to have been triggered by a conflict with his boss [who] apparently chastised him at work. The patient feels this is unfair and has not been back to work since. It is difficult to pull apart here his depression from his inability to get along with his boss. I've encouraged him all along to seek a transfer and apparently he has not contacted anybody yet. At this point I have told him all along he needs to go back soon and [the] date set for that is 10/15/12. At this point I think he should be okay to go back from [the] point of view of depression. Whether he is going to get along with his boss or not is another question. He has not made any threatening comments to make me believe he is a threat to anyone at work. I leave it up to the patient where he is going to work and whether he is going to go back to work. I have strongly encouraged him to transfer to another department or away from his boss, he could leave his job if transferring is not feasible and he has talked about retiring, which is also an option. However he needs to make up his mind and get going on something. To the best of my knowledge he is still not got involved in an employee assistance program either.

(*Id.* at 28)  Dr. Riley also reported he asked Claimant to look for a new psychiatrist, and to contact someone in human resources at his job about a transfer out of his department. (*Id.*)  Claimant last saw Dr. Riley on October 11, 2012.  The progress notes suggest no change from the previous visit.  (*Id.* at 29-30)

Dr. Riley completed an "Attending Physician's Statement of Disability" dated October 2, 2012.  (Doc. 18-8 at 7-9)  This form addressed "mental health claims."  (*Id.* at 7)  Dr. Riley indicated that Claimant's condition was related to his work environment, and he diagnosed Claimant as having major depressive disorder, generalized anxiety disorder, obsessive compulsive disorder, and panic, as well as hypertension, asthma, sciatica and neck pain.  (*Id.* at 7)  Dr. Riley identified Claimant's attitude as "guarded," his speech as "halted," his thought process as "logical/coherent," his insight into his illness as "good," his psychomotor activity as "[within normal limits]," his attention as "intact," and his concentration and memory as mildly impaired.  (*Id.*)  Dr. Riley also opined on Claimant's ability at that time to perform a number of activities during an 8-hour work day.  He concluded that Claimant demonstrated "no ability" to:  direct, control or plan the activities of others; influence people in their opinions, attitudes and judgements; or deal with people.  (*Id.* at 8)  Dr. Riley indicated he thought Claimant had only minimal ability (0-33% of a day) to: perform a variety of duties; express personal feelings; make judgments and decisions; or display reliability/consistency.  (*Id.*)  He opined that Claimant then had moderate ability (34-67% of a day) to: attain precise set limits, tolerances, and standards; or working under specific instructions.  (*Id.*)  Dr. Riley also indicated that Claimant maintained "full" ability (68-100% of a day) to:  perform repetitive or short-cycled work; or work alone or apart in physical isolation from others. (*Id.*)

### 4. *Dr. Win Kressel, Chiropractor*

On January 9, 2013, Dr. Win Kressel wrote a letter to the Social Security Administration regarding a disability determination for Claimant.  (Doc. 18-8 at 47)  Dr. Kressel noted that Claimant's MRI dated November 5, 2012 indicated a loss of disc

height at L5/S1 with "disc bulging and an annular tear[,]" and further, that Claimant had facet arthropathy at L4/L5. (*Id.* at 47) The doctor indicated that Claimant had "difficulty walking" and used a cane, experienced pain sitting and standing for even short periods, and should avoid any lifting or bending. (*Id.*)

> ### 5.    *Amy Ryn, D.O.*

Claimant was seen by Dr. Amy Ryn on October 7, 2013. (Doc. 18-8 at 105-109) The appointment notes primarily address Claimant's diabetes, cholesterol, and a finger injury. (*Id.*) Dr. Ryn's notes indicate that Claimant was using a cane due to low back pain. (*Id.* at 107) She ordered blood tests. (*Id.* at 108) An x-ray of Claimant's left hand indicated that his injured left hand, fourth finger appeared normal. (*Id.* at 109)

Claimant saw Dr. Ryn on January 6, 2014, to follow up on his back pain. (*Id.* at 102-104) She noted that Claimant reported his pain as worsening, and radiating down into his bilateral thighs and calves. (*Id.* at 102) She further noted that Claimant demonstrated "no unusual anxiety or evidence of depression." (*Id.* at 103) She prescribed Ibuprofen and use of an at-home transcutaneous electrical nerve stimulation (TENS) unit for his back pain. (*Id.* at 104)

During an April 7, 2014 office visit, Dr. Ryn noted that Claimant reported his back pain at a severity of 7, and that the pain occurred intermittently. (*Id.* at 99) She observed that Claimant was negative for gait disturbance and negative for psychiatric symptoms. (*Id.* at 100) She documented that Claimant was under the care of a chiropractor, Dr. Kressel, and that Claimant was referred to pain management. (*Id.* at 101)

Dr. Ryn saw Claimant again on November 6, 2014. (*Id.* at 94-97) She reported that he was negative for psychiatric symptoms, and exhibited an appropriate mood and affect. (*Id.* at 96) The doctor did not mention Claimant's back pain other than to indicate that he continued to take Ibuprofen and that he was under the care of pain management. (*Id.* at 94-97)

6. *Michael Frost, FNP-BC (The Pain Center of Arizona)*

When Claimant initially presented to Family Nurse Practitioner Michael Frost on May 30, 2014, he complained of pain severity of 8 out of 10 in the back of his head and neck, his entire upper back, lower back, buttocks, hips, legs, and shoulders, with numbness in his arms and fingers. (Doc. 18-8 at 142) He reported that previous treatments, including chiropractic care, massage therapy, home exercise, prescription medication and over-the-counter medication either made no change or had no effect. (*Id.*) Claimant reported coordination problems, memory loss, concentration difficulties, tremors and weakness, as well as anxiety and depression. (*Id.* at 143) On a depression questionnaire, Claimant reported suffering from each of the problems listed. (*Id.* at 146)

During a visit on July 2, 2014, Claimant's reported pain symptoms were much as they had been a month earlier. (*Id.* at 138-141) It was noted that his mood and affect were normal. (*Id.* at 141) He continued to use a cane for walking. (*Id.*) Nurse Practitioner Frost recommended that Claimant begin receiving physical therapy. (*Id.*) The examination notes indicated that Claimant continued to struggle to find "positions of comfort." (*Id.*)

At Claimant's October 6, 2014 examination, he declared that the severity of his symptoms had worsened. (*Id.* at 134) Claimant was referred for an MRI of the lumbar spine, with the possibility that Claimant could require steroid injections. (*Id.* at 136)

On November 12, 2014, Nurse Practitioner Frost assessed Claimant's neck pain and his lumbar spine degenerative disc disease as unchanged, but his lumbar radiculopathy as having worsened. (*Id.* at 132) An MRI of his lumbar spine was reviewed, indicating: (1) an annular tear at L5-S1 with a disc bulge, but not contacting anything; and (2) an L4-5 annular tear had shifted to an L5-S1 annular tear. (*Id.* at 133) Frost documented that Claimant continued to have some cervical pain, exhibited a normal mood, and was in no acute distress. (*Id.*)

### 7.    *Banner Gateway Medical Center E.R., David Zimmerman, PA-C*

Claimant was seen by Physician's Assistant David Zimmerman at the emergency room of the Banner Gateway Medical Center on November 1, 2012, where he reported severe back pain which had commenced about three weeks prior, and was improving after seeing a chiropractor "a few times," but which worsened after a sneezing fit the day before his presentment to the emergency room.  (Doc. 18-8 at 35)  Claimant's physical examination notes indicated that he experienced focal tenderness over his left sciatic region, that he was able to stand with assistance and was ambulatory, and tested with a normal range of motion.  (*Id.* at 37)  The medical imaging reviewed by Dr. Mirza, discussed below, indicated mild vertebral abnormalities.  (*Id.* at 34)  Claimant was prescribed Valium, Toradol (an anti-inflammatory), and Percocet (a narcotic painkiller) for a few days, as needed, advised to apply ice, and follow up with his personal care physician. (*Id.* at 38)

### 8.    *Images of Claimant's spine*

On July 15, 2007, a radiologic exam was performed by George Engisch, D.O. (Doc. 18-8 at 117)  Dr. Engisch's findings were as follows:

> [s]tudy of the lumbar spine reveals some minimal degenerative lipping about the anterolateral aspect of the superior endplates of L4 and L5.  There is some subtle disk space narrowing at the L5-S1 interspace. The remaining intervertebral disk spacing is preserved.    The soft parts appear unremarkable.

(*Id.*)

On August 31, 2011, Dr. Jeffrey J. Fitzgerald, a radiologist, performed a "radiologic exam spine lumbosacral, minimum of 4 views, x-ray spine, cervical, anteroposterior and lateral, minimum of 4 views."  (*Id.* at 43)  Dr. Fitzgerald's findings regarding Claimant's cervical spine included:    (1) "[m]ild C4-C5 through C6-C7 degenerative disc disease" and also "[m]ild bilateral uncovertebral and facet joint [degenerative joint disease] at these levels as well"; and (2) other findings were all normal. (*Id.*) The doctor's findings regarding Claimant's lumbar spine were:  (1) "m]ild

bilateral lower lumbar spine facet arthropathy, and "[m]ild bilateral [sacroiliac] joint [degenerative joint disease]"; and (2) no change in the "straightening of normal lumbar lordosis" or in Claimant's "minimal diffuse lumbar spine degenerative disc disease" when compared to lumbar spine radiographs taken on January 29, 2007. (*Id.*)

On November 5, 2012, Jordan K. Cohen, M.D., a radiologist, evaluated images of Claimant's lumbar spine. (*Id.* at 41) His evaluation included a comparison with images taken in July 2011. (*Id.*) Dr. Cohen's findings were that: (1) there was a new minimal disc bulge abutting the thecal sac at the level of L2-L3 and the neural foramina were patent; (2) a disc protrusion at the level of L3-L4 had improved; (3) a disc protrusion at the level of L4-L5 had improved, and minimal facet arthropathy was observed, without evidence of stenosis; and (4) at the level of L5-S1, there was a new "loss of disc height with disc bulging and an annular tear causing mild flattening of the thecal sac," and the neural foramina were patent. (*Id.*)

On November 1, 2012, Dr. Rizvan Mirza read three images of Claimant's lumbar spine. (*Id.* at 34) Dr. Mirza's interpretation read: "No acute fracture or bone destruction. Alignment is normal. Mild L5-S1 disc space narrowing. Mild anterior osteophytosis." (*Id.*)

On June 12, 2014, x-rays were taken of Claimant's lumbosacral spine. (*Id.* at 157) Radiologist Angela Fried, M.D., read the x-rays, and found: (1) normal alignment of the vertebrae, with no evidence of fracture or dislocation; (2) mild loss of disc base height at L5-S1; (3) large osteophytes at the L2-L3 level; (4) no spondylolysis; and (5) no change in alignment on flexion or extension. (*Id.*)

Claimant received an MRI study on October 14, 2014. (*Id.* at 154-156) The images were read by Timothy Sanders, M.D., a radiologist. (*Id.* at 155-156) Dr. Sanders noted there was a "[s]ubtle 3 mm right lateral noncompressive disc herniation L3-L4," a "tear of the posterior annulus with mild disc bulge L5-S1 without focal disc herniation," and "mild multilevel disc desiccation." (*Id.* at 155)

9.      *Physical Therapy records*

The record includes documents for two physical therapy sessions in 2014.  (Doc. 18-8 at 86-93)  At the first of his sessions on July 30, 2014, Claimant was assessed as experiencing mild limitations in dressing, moderate limitations in sitting, bending, standing, bathing and grocery shopping, and severe limitations in walking, housework and driving.  (*Id.* at 86)  The physical therapist recommended that Claimant receive therapy twice a week for four weeks.  (*Id.* at 89)  Claimant's final session occurred on September 24, 2014.  (*Id.* at 90-93)  A "discharge note" indicates that Claimant had obtained eight sessions.  (*Id.* at 90)  Claimant estimated that he had realized only ten percent of his goal to return to his prior level of functioning.  (*Id.*)  After noting that Claimant had "not been able to make progress towards established goals[,]" his physical therapist recommended he be discharged with a home exercise program.  (*Id.* at 93)

C.      **Examining Physicians' Assessments**

1.      *Examining psychologist John D. Mather, Ph.D.*

Dr. John D. Mather examined Claimant on February 13, 2013 in connection with Claimant's application for Social Security Disability benefits.  (Doc. 18-8 at 59-70)  Dr. Mather conducted a records review, a clinical interview, and a Mini Mental Status Examination ("MMSE").  Dr. Mather observed Claimant's use of a cane to walk with a "slow and laborious gait."  (*Id.* at 60)  Claimant reported that he walked "short distances for exercise."  (*Id.* at 62)

Claimant performed very poorly on the MMSE.  (*Id.* at 64)  Dr. Mather was highly suspicious that Claimant was malingering, given Claimant's ability to otherwise recall the days of events and the details of his morning, correctly spell a word backwards, name the current and past two Presidents, and that he had succeeded in rising to a supervisory position in his most recent job.  (*Id.* at 64-65)  The doctor concluded that Claimant's overall "perceptual, language and sensorimotor skills appear to be within average limits."  (*Id.* at 65)  Mather was also dubious about Claimant's assertion that he needed help with the most basic activities of daily living, and reported he observed Claimant:  crumple a

tissue and hand it back to Mather; hold a pencil to successfully write and draw; support a piece of paper with his left hand while writing with his right hand; and go from a sitting position to a standing position at least four times without problem.  (*Id.* at 66)

Dr. Mather described Claimant as being alert, with abundant and spontaneous thought processes, intact receptive and expressive languages, good continuity of thought, and displaying a generally full and appropriate affect.  (Doc. 18-8 at 64)  Dr. Mather noted that, other than while taking the MMSE, Claimant "demonstrated what appeared to be adequate sustained attention, adequate mental persistence (concentration), intact short-term memory, intact working memory, and intact long-term declarative and episodic memories."  Because Claimant's MMSE scores did not reflect these abilities, Dr. Mather suspected Claimant of symptom exaggeration and/or malingering.  (*Id.* at 66)  Despite this suspicion, the ALJ concluded that Claimant "may require additional testing to determine true levels of neurocognitive functioning," along with "measures [to test] malingering."  (*Id.*)

Dr. Mather diagnosed Claimant with Dysthymic Disorder and Generalized Anxiety Disorder, with a notation to "rule out" malingering. Courts have noted that a "rule-out" notation signifies there is evidence that a patient meets the criteria for the diagnosis, but the doctor needs more information to make the diagnosis without qualification.  *See Hansen ex rel. J.H. v. Republic R–III Sch. Dist.*, 632 F.3d 1024, 1027 n. 3 (8th Cir. 2011); *United States v. Grape*, 549 F.3d 591, 593 n. 2 (3rd Cir. 2008); *Johns v. Jarrard*, 927 F.2d 551, 555 n. 1 (11th Cir. 1991).  Providing detailed findings from his examination of Claimant, Dr. Mather concluded that Claimant did not have deficits in his memory or understanding, restrictions in his social behavior, or an inability to adapt to change that would prevent him from engaging in gainful activities.  (*Id.* at 69)

### 2.    *Examining Psychologist Colin Joseph, Ph.D.*

Dr. Colin Joseph examined Claimant on October 2, 2013, after Claimant was referred by the state agency regarding his application for disability benefits.  (Doc. 18-8 at 73-78)  Dr. Joseph documented that he had reviewed the assessment of Dr. Mathers,

and included a summary of Mather's assessment in his report. (*Id.* at 73) Dr. Joseph described Claimant as walking with a cane, and limping. (*Id.*) He characterized Claimant as irritable throughout the evaluation. (*Id.*) Claimant told Dr. Joseph that after an altercation with his supervisor, he had consulted with his primary care provider because of his "anger and irritability," and was advised to take some time off work. (*Id.* at 74) Claimant also explained that he had suffered from back pain, and went on medical leave from work in August 2012. (*Id.*) Claimant further advised Dr. Joseph that during the spring of 2013, he had been advised that his medical leave had run out and he had been terminated from his position. (*Id.*) He explained that medications he was prescribed in August 2012 helped his anger and irritability, but he could not afford to refill the prescriptions. (*Id.* at 75)

Regarding activities of daily living, Dr. Joseph documented that Claimant reported attending to his own hygiene, needing help to put on his shoes and socks, being able to walk to the grocery store using a cane, doing some household chores, and driving at times, but limiting his driving "because of poor concentration." (*Id.* at 75-76)

Dr. Joseph concluded that Claimant appeared motivated to minimize some issues, such as his struggles with anger and irritability, but also to exaggerate his perceived mistreatment by others. (*Id.* at 76) The doctor concluded that Claimant experienced "genuine mood disturbance," and that his "interpersonal/social behavior [was] strongly suggestive of a characterological issue." Like Dr. Mather, Dr. Joseph concluded that while Claimant "performed poorly on some mental status exam tasks[,] there was nothing in his presentation suggest[ing] cognitive impairment. (*Id.*) Dr. Joseph assessed Claimant as likely having "some difficulty remembering detailed instruction and maintaining attention and concentration on work-related tasks." (*Id.* at 77) The doctor concluded that Claimant would be "prone to misinterpret social cues; tak[e] things personally, feeling he is being treated unfairly; and in turn becom[e] irritable and oppositional." (*Id.*) Dr. Joseph further concluded that Claimant was "adequately aware

of his surroundings," and that he likely could "respond appropriately to normative workplace hazards." (*Id.*)

### 3. Examining Physician Jared Fairbanks, D.O.

Claimant was evaluated by Jared Fairbanks, D.O., on December 7, 2013. (Doc. 18-8 at 79-85) Dr. Fairbanks reviewed a January 9, 2013 note from Dr. Kressel, Claimant's chiropractor, and the results of Claimant's November 5, 2012 MRI, "with impression of improvement of minimal disc protrusions at L3-L4 and L4-L5 without involvement of the exiting nerve roots[, and] [d]evelopment of disc bulging at L5-S1 causing mild flattening of the thecal sac." (*Id.* at 79) Dr. Fairbanks reported that Claimant:

> denied significant impact on activities of daily living. [He] is able to complete self-care activities including meals, hygiene, and light house work. [He] is able to ambulate without assistance and without difficulty. [He] is not confined to bed, and gets adequate sleep. [He] is able to take off shoes from a sitting position, including bending over, and untying shoe strings. [He] is able to drive a vehicle to meet medical, social and work obligations.

(*Id.* at 80) Among Dr. Fairbanks' observations were that: (1) Claimant sat in a chair without discomfort; (2) he was able to stand and walk to the examination table and to get on and off the table without difficulty; (3) he walked with an antalgic gait and had difficulty stooping; (4) he could not lift his right foot and stand without assistance, and lost his balance attempting to heel and toe walk; (5) he could stand from a sitting position and also sit down from a standing position without difficulty or assistance; and (6) he was observed going down stairs. (*Id.* at 81) The doctor found Claimant to be alert and oriented, with "congruent" affect and speech, and a cogent thought process. (*Id.*) Dr. Fairbanks found that Claimant had a normal range of motion of his cervical spine, and noted no weakness or pain. (*Id.*) Dr. Fairbanks observed "full active and passive range of motion" in Claimant's thoracic and lumbar spine, and also noted that Claimant complained of pain with palpitation or movement of his back. (*Id.* at 82) Additionally,

Dr. Fairbanks documented that Claimant complained of pain and shooting pain down the backs of his legs with straight leg lift greater than 30 degrees and also when Claimant "was extended at the lumbar spine with lateral side-bending, indicative of facet arthropathy." (*Id.* at 83) Dr. Fairbanks assessed Claimant with no conditions that would impose any limitations for 12 continuous months. (*Id.* at 84)

### D. Non-examining State Agency Medical Consultant Assessments

State agency consultant Carol Mohney, Ph.D., provided state agency initial record review of Claimant's psychiatric condition on March 22, 2013. (Doc. 18-4 at 2-27) Dr. Mohney indicated that Claimant had been diagnosed with "severe" affective disorders and anxiety-related disorders. (*Id.* at 9) Pursuant to the "A" Criteria of the listings, Dr. Mohney reported that these disorders did not "precisely satisfy the diagnosis criteria," and under the "B" Criteria of the listings, noted there was "insufficient evidence" to establish how his mental limitations impacted his functioning. (*Id.*) Dr. Mohney provided additional explanation of her review of Claimant's medical records:

> 58 year-old claimant with history of treatment for depression and anger. [Mental status exam] from Biltmore Health Care (10/11/12) has MSE all within normal limits. [Activities of daily living] indicated fixes easy meal[s], does some chores. Goes out alone, doesn't drive due to physical problems, shops, manages finances, socializes, handles written instructions "good" and spoken "fair." At [consultative examination] claimant given diagnoses of Dysthymic Disorder, [generalized anxiety disorder], and [report of] malingering with provider noting that claimant appeared to exaggerate his symptoms during the [mini mental status exam] and "is at a very high risk for malingering." No functional limitations were noted.

(*Id.*)

Jonathan Norcross, M.D., performed a medical physical assessment of Claimant's record on initial review. (*Id.* at 10-14) The Physical Residual Functional Capacity ("RFC") assessment indicated that Claimant: (1) was capable of occasionally lifting and/or carrying 20 pounds; (2) frequently lift and/or carry 10 pounds; (3) standing and/or walking for a total of 6 hours in an 8-hour work day, with normal breaks; and (4) sitting

for a total of 6 hours in an 8-hour work day, with normal breaks. (*Id.* at 11) The assessment further indicated that Claimant was capable of occasionally: climbing ramps or stairs; climbing ladders, ropes, or scaffolds; balancing, stooping, kneeling, crouching, and crawling. (*Id.*) Claimant was assessed as having no manipulative, visual, communicative or environmental limitations. (*Id.*)

Upon reconsideration by the state agency, Susan Daugherty, Ph.D., performed an assessment of Claimant's psychiatric condition, which included additional medical record review. (*Id.* at 41-42) Dr. Daugherty applied the psychiatric review technique, and found: (1) mild restriction of activities of daily living; (2) moderate difficulties in maintaining social functioning; (3) moderate difficulties in maintaining concentration, persistence or pace; and (4) no repeated episodes of decompensation. (*Id.* at 41) Dr. Daugherty also performed a Mental RFC assessment for Claimant, based on the medical record. (*Id.* at 45-46) She indicated that Claimant was subject to some limitations in the areas of concentration and persistence, social interaction, and adaptation. (*Id.*) Dr. Daugherty found that Claimant was subject to moderate limitations in his ability to: carry out detailed instructions; maintain attention and concentration for extended periods; sustain an ordinary routine without special supervision; complete a normal work day and work week without interruptions from psychologically based symptoms; perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals and make plans independently of others. (*Id.*)

Dr. Daugherty determined Claimant demonstrated <u>no</u> evidence of limitation in his ability to: carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; work in coordination with or in proximity to others without being distracted; make simple work-related decisions; interact appropriately with the public; ask simple questions or request assistance; get along with coworkers without distracting them or exhibiting

behavioral extremes; maintain socially appropriate behavior or adhere to basic standards of neatness and cleanliness; travel in unfamiliar places or use public transportation; or be aware of normal hazards and take appropriate precautions. (*Id.*)

Also on reconsideration, Stephen Whaley, M.D., assessed Claimant's physical RFC. (*Id.* at 43-44) Dr. Whaley opined that Claimant: (1) was capable of occasionally lifting and/or carrying 50 pounds; (2) could frequently lift and/or carry 25 pounds; (3) could stand and/or walk for a total of 6 hours in an 8-hour work day; and (4) could sit for a total of 6 hours in an 8-hour work day. (*Id.* at 43) Dr. Whaley assessed Claimant as subject to no postural or other limitations. (*Id.*)

## II.    STANDARD OF REVIEW

Under 42 U.S.C. § 405(g), this court must affirm the Commissioner's decision to adopt the ALJ's findings if his findings are supported by substantial evidence and are free from reversible error. *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "Substantial evidence is more than a mere scintilla, but less than a preponderance." *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1998). "It is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).

In determining whether substantial evidence supports the ALJ's decision, the court considers the record as a whole, weighing both the evidence that supports and that which detracts from the ALJ's conclusions. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1988). The ALJ is responsible for resolving conflicts in medical testimony, ambiguity in the record, and determining credibility. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If there is sufficient evidence to support the ALJ's outcome, the Court cannot substitute its own determination. *See Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990). Although the Court "must do more than merely rubberstamp the ALJ's decision[,]" *Winans v. Bowen*, 853 F.2d 643, 645 (9th Cir. 1988), where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citations omitted).

## III.    LEGAL STANDARDS

Claimant bears the burden of proving disability under the Social Security Act. *Tidwell v. Apfel*, 161 F.3d at 601. He meets this burden if he can establish that he has a physical or mental impairment that prevents him from engaging in any substantial gainful activity and that is expected to result in death or to last for a continuous period of at least one year. 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A). Claimant's impairments must be such that he is not only unable to perform his past relevant work, but also that he cannot, considering his age, education and work experience, engage in other substantial gainful work existing in the national economy. *Id.* at §§ 423(d)(2) and 1382c (a)(3)(B).

The Commissioner applies a five-step sequential process to evaluate disability. 20 C.F.R. §§ 404.1520 and 416.920. In the first three steps, the Commissioner determines: (1) whether a claimant has engaged in substantial gainful activity since the alleged onset; (2) whether he has a "severe" impairment or a combination of impairments that is "severe"; and (3) whether the severity of any impairment meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R., Pt. 404, Subpt. P, App. 1). *Id.* If a claimant complies with these three steps, he will automatically be found disabled; if that claimant satisfies steps one and two but not three, he must then satisfy step four. *Id.* Before considering step four, the ALJ must assess the claimant's RFC, *see* 20 C.F.R. § 404.1520(a)(4)(iv), which is "the most [the claimant] can still do despite [the claimant's] limitations." *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1097 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)). The RFC assessment is "based on all the relevant medical and other evidence" in the claimant's record. *Id.* (quoting 20 C.F.R. § 404.1520(e)). In determining a claimant's RFC, the ALJ must consider all of a claimant's medically determinable impairments, including those that are not severe. 20 C.F.R. § 404.1545(a)(2).

At step four, the ALJ considers the claimant's RFC and past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If a claimant is able to perform his past relevant work, he is not found to be disabled. *Id.* When a claimant satisfies step four, the burden shifts from

him to the Commissioner to establish the claimant is capable of performing work in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (claimant bears the burden of proof on the first four steps, but the burden shifts to the Commissioner at step five). The fifth and final step involves the ALJ's decision whether a claimant is able to make an adjustment to other work, given the ALJ's assessment of the claimant's RFC and age, education and work experience. 20 C.F.R. § 404.1520(a)(4)(v).

## IV. ADMINISTRATIVE HEARING

The ALJ conducted a hearing on Claimant's application on January 6, 2015. (Doc. 18-3 at 48-85) Claimant testified that his last job was as a supervisor for a social services agency, which began in 1995 and ended on August 6, 2012. (*Id.* at 54-55) Included in the duties Claimant described were: maintaining and supervising staff, monitoring work by walking the office, moving office furniture during staff relocation, and some janitorial tasks. (*Id.* at 54) Claimant explained that he was terminated in April 2013 after he did not return to work. (*Id.* at 56) Claimant said that he drove occasionally while on errands and traveling to visit his mother and his girlfriend's relatives. (*Id.* at 59-62)

When asked how he spent his time, Claimant responded that he sat and watched TV, and did not have any hobbies, recreational or other activities. (*Id.* at 63-64) He testified that he belonged to no clubs or organizations, and paid a portion of the household bills. (*Id.* at 64) Claimant stated that he tried to help do dishes and prepare meals, but had problems, and sometimes was not able to use the toilet, bathe, and dress himself. (*Id.* at 65-66) He explained that his back spasms impeded him, and his right hand was so "worn out" that he had trouble using it. (*Id.* at 66-67)

Claimant stated that he had been referred to behavior management classes to address his anger, depression, and anxiety in September 2012, but that he attended two or three classes and quit attending when his insurance company told him it would not cover the expense. (*Id.* at 69) He said he took medications for depression, anxiety and anger, as well as for diabetes. (*Id.*) Additionally, Claimant said he took Ibuprofen 800 for pain,

used a spray for his allergies and asthma, and took two other prescriptions for back pain. (*Id.* at 69-70)  He testified the pain pills for his back helped "a little bit."  (*Id.* at 70)

On questioning by his counsel, Claimant explained there were times that his hands shook so much he could not hold a spoon or a piece of paper.  (*Id.* at 70-71)  He further declared that he could only lift his right arm about "halfway up," could sit only for 10 to 15 minutes at a time due to lower back and buttock pain, and that walking also caused pain to go down one of his legs.  (*Id.* at 73-74)  He said he had not yet been given injections for back pain relief, but expected to receive them.  (*Id.* at 74)  He stated that it helped his pain to lie stretched out on the floor, and would do that ten times during the day.  (*Id.* at 76)

The Vocational Expert ("VE") characterized Claimant's past work as requiring a "combination of supervising personnel, doing data entry, [and] mentoring new employees."  (*Id.* at 77)  The VE concluded that the position of administrative assistant best captured the duties of Claimant's past relevant work.  (*Id.* at 78)  The ALJ posed a hypothetical question in which a claimant had the RFC to perform light work, but was "limited to occasionally climbing ramps or stairs, and ladders, balancing, stooping, kneeling, crouching, reaching, handling, and fingering, pushing, and pulling; never climbing ropes, or scaffolds, or crawling; would have to avoid concentrated exposure to pulmonary irritants and hazards."  (*Id.* at 78-79)  The ALJ asked whether a claimant with this RFC could perform Claimant's past work, either as he actually performed it, or as it is generally performed in the national economy.  (*Id.*)  The VE said a claimant could not. (*Id.* at 79)

When the ALJ asked the VE whether there would be "transferable skills to other light work within that [RFC]," the VE replied, "[n]o, any transferable skills will still require reaching, handling, and fingering at a rate greater than occasional."  (*Id.* at 79)  The ALJ then asked the VE whether this conclusion would change if the hypothetical claimant could frequently push and pull, reach, handle, finger and feel, rather than doing

so only occasionally. (*Id.*) In this circumstance, the VE opined that the positions of administrative assistant and office manager would match the described RFC. (*Id.* at 80)

At this point, Claimant's counsel questioned him to clarify how much of the week he was lifting and carrying objects, and estimate the average weight of the objects. (*Id.* at 82) Claimant replied that "about 70 percent of the week I was always hauling banker boxes[,]" and that the average weight of the banker boxes was "in the area of " "a good 20, 25, 40 pounds, maybe[.]" (*Id.*) Claimant's counsel said that she was concerned about the classification of Claimant's jobs as sedentary. (*Id.* at 83) Claimant's counsel asked the VE whether an employee who required the ability to change positions as needed and also required a recumbent rest option during working hours could keep a job. (*Id.*) The VE responded that a person in a sedentary or light supervisory or managerial job would have the latitude to be able to change position as needed. (*Id.*) He also stated, however, that he had concerns about a person's ability to be in a recumbent position and still maintain employment. (*Id.* at 84)

## V.  ALJ's DECISION

The ALJ issued an unfavorable decision on May 11, 2015. (Doc. 18-3 at 23-37) He noted that Claimant's alleged disability onset date was August 6, 2012, and that he had accumulated "sufficient quarters of coverage" to meet the insured status requirements through December 31, 2017. (*Id.* at 24) At Step 2 of the sequential analysis, the ALJ found that Claimant was subject to the severe impairments of "cervical degenerative disc disease, cervicalgia, lumbar degenerative disc disease with radiculopathy, and asthma/allergic rhinitis (20 CFR 404.1520(c) and 416.920(c))." (*Id.* at 26) The ALJ did not list any of Claimant's diagnosed mental impairments as severe. At Step 3, the ALJ found that Claimant did not have "an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." (*Id.* at 30) The ALJ found that Claimant maintained the RFC to perform light work, with limitations. (*Id.* at 31) These limitations included that Claimant

could:  (1) frequently reach, handle, finger and feel, push and pull; (2) occasionally climb ramps, stairs and ladders, balance, stoop, kneel and crouch; and (3) never crawl, climb ropes or scaffolds.  (*Id.*)  The ALJ also found that Claimant would need to avoid concentrated exposure to hazards and pulmonary irritants.  (*Id.*)

The ALJ concluded that Claimant was capable of performing his past relevant work as an administrative assistant and office manager, as those jobs are generally performed in the national economy.  (*Id.* at 36)  Accordingly, the ALJ found Claimant not disabled, as defined in the Social Security Act, from his alleged onset date through the date of his decision.  (*Id.*)

## VI.    DISCUSSION

As noted, Claimant argues the ALJ erred by improperly:  (1) finding that Claimant could perform his past job "as generally performed"; (2) finding that Claimant did not suffer from a "severe" impairment or a combination of impairments that is "severe" in Step 2 of the sequential analysis; and (3) making a deficient credibility assessment by not discussing Claimant's positive work history.  (Doc. 22 at 1-2)  Each argument is addressed below, in turn.

### A.    Whether the ALJ erred in finding Claimant could perform his past work as generally performed

Claimant contends his past work as generally performed is a "composite job," and that the ALJ's finding that he could perform the duties of the positions of administrative assistant and of office manager was legally insufficient because the finding was based on only some of the duties of this job.  (Doc. 22 at 6-11)  Claimant bases his argument that his past position was a composite job on the following testimony at hearing by the VE:

Q:    Can you classify his past work?

A:    Yes, I can. This individual, I'm looking at the description of his work and the work history for the combination of supervising personnel, doing data entry, mentoring new employees.  There's, basically – you know, I'd give it three job titles to encompass it all, and he uses a very specific job title of PSE IV and that's specific to Social Services within the area that he worked.

(Doc. 18-3 at 77, Doc. 22 at 8)  The VE specified that the three positions he identified within the Dictionary of Occupational Titles ("DOT") were:  Office Manager (DOT 169.167-034), Data Entry Clerk (DOT 203.582-054), and Administrative Assistant (DOT 169.167-010).  (*Id.* at 78)  However, the VE subsequently declared that the position of Administrative Assistant "may really encompass all of it."  (*Id.* at 78)  He then stated, "in fact, if I were to look at those three jobs I would say the administrative assistant best captures it. But so the record is complete I put in the other two as well."  (*Id.*)

The VE's intention of listing each of these three jobs as representative of Claimant's past job, rather than combined as a composite job, was further clarified when addressing the ALJ's hypotheticals to the VE.  (*Id.* at 78-80)  The VE considered each of the three job titles as stand-alone positions and not as a single, composite job.  The ALJ's decision was predicated on the understanding that these three positions were provided by the VE as individually representative of Claimant's PSE IV job.  (Doc. 18-3 at 36)  The ALJ found that Claimant could perform his past relevant work in the position of Administrative Assistant and also in the position of Office Manager, as these positions are generally performed in the national economy.  (*Id.*)

Claimant contends that the ALJ's finding was erroneous "because there is simply no evidence as to the DOT job that corresponds with the significant lifting, standing, and walking tasks that [Claimant] was required to perform as part of his actual past work."  (Doc. 22 at 9)  As noted, however, the ALJ found the positions of Administrative Assistant and Office Manager represented Claimant's past relevant work as these positions are generally performed in the national economy.  (Doc. 18-3 at 36)  "At step four of the sequential analysis, the claimant has the burden to prove that he cannot perform his prior relevant work 'either as actually performed or as generally performed in the nation economy.'"  *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1166 (9th Cir. 2008) (quoting *Lewis v. Barnhart*, 281 F.3d 1081, 1083 (9th Cir. 2002)).  In *Stacy v. Colvin*, the Ninth Circuit cited social security rulings explaining how the "generally performed test" is applied:

A former job performed in by the claimant may have involved functional demands and job duties significantly in excess of those generally required for the job by other employers throughout the national economy. Under this test, if the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be "not disabled."

*Stacy v. Colvin*, 825 F.3d 563, 569 (9th Cir. 2016) (quoting SSR 82-61, 1982 WL 31387 (1982)).

In a work history report Claimant filled out on December 14, 2012, he described his prior relevant job as a PSE IV as including: data entry, supervising personnel, working with customers, reviewing cases for accuracy, mentoring new employees, monitoring workers, and producing work reports. (Doc. 18-7 at 25-26) He indicated that he had supervised ten to 15 people, and that he spent eight hours a day supervising people. (*Id.* at 26) In his work history report, Claimant indicated that he performed lifting and carrying for the purpose of "moving worker[s] from cubicles," and listed computers, desks, chairs and file cabinets as items he relocated. (*Id.*) He did not indicate how often he performed lifting and carrying, although the question asked for this information. (*Id.*) The ALJ referred to Claimant's work history report in his decision, and concluded that "based on the claimant's work history and the vocational expert's testimony, the undersigned concludes that the above-listed [three positions] encompass the claimant's past relevant work as a 'PSE IV' . . . ." The ALJ documented that "pursuant to SSR 00-4p, [he had] determined that the vocational expert's testimony is consistent with the information contained in the [DOT]." (Doc. 18-3 at 36)

On this record, the Court concludes that the ALJ reasonably relied on the VE's expert testimony to find that Claimant could return to his past relevant work, identified as the position of Administrative Assistant in the DOT, and that the ALJ's decision was supported by substantial evidence. Moreover, Claimant has not met his burden to establish that he cannot perform his prior relevant work as generally performed in the nation economy.

**B.    Whether the ALJ erred in finding Claimant's mental impairments not severe**

At Step 2 of the sequential evaluation, the ALJ concluded that "[s]ince the claimant's medically determinable mental impairments cause no more than 'mild' limitation in any of the first three functional areas and 'no' episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere (20 CFR 404.1520a (d)(1) and 416.920a(d)(1))."  (Doc. 18-3 at 28)  Claimant argues that, in light of opinions on his mental limitations, the ALJ erred in finding that such limitations did not meet the *de minimis* Step 2 standard, and that the ALJ's RFC finding, without including any "mental limitations," and denial of his claim at Step 4 of the sequential evaluation, were legal error and lacking support by substantial evidence.  (Doc. 22 at 11)

As noted, at Step 2 the ALJ found Claimant had the severe impairments of cervical degenerative disc disease, cervicalgia, lumbar degenerative disc disease with radiculopathy, and asthma/allergic rhinitis.  (Doc. 18-3 at 26)  The ALJ specifically addressed his assessment of Claimant's asserted limitations involving major depressive disorder, general anxiety disorder, panic disorder and adjustment disorder, both separately and in combination.  (*Id.* at 26-30)  The ALJ concluded that these impairments did not cause "more than minimal limitation in the claimant's ability to perform basic mental work activities," and were therefore non-severe.  (*Id.* at 26)  In arriving at this conclusion, the ALJ assessed the "paragraph B" criteria to determine the severity of Claimant's mental impairments (*Id.* at 28), and concluded that Claimant's mental impairments caused only "mild" limitations in the functional areas of: activities of daily living; social functioning; and in concentration, persistence or pace.  (*Id.* at 26-27)  Regarding the functional area involving episodes of decompensation, the ALJ concluded the record did not support a finding that Claimant had not experienced repeated episodes of decompensation of extended duration during the relevant period.  (*Id.* at 28)

The ALJ discussed the findings of non-examining consultative examiners Carol Mohney, Ph.D. and Susan Daugherty, Ph.D.  (*Id.*)  He noted that Dr. Mohney concluded

that Claimant's affective disorder was "severe," but that there was insufficient evidence to evaluate the paragraph B criteria, and that Dr. Daugherty assessed Claimant has having "moderate' difficulties with regard to social functioning and maintaining concentration, persistence or pace.  (*Id.*)  The ALJ accorded "little weight" to these psychologists, in light of their assessments being limited to a review of Claimant's records, and stated that he gave greater weight to the opinions of the consultative examining psychologists, Drs. Mather and Joseph.  (*Id.*)

The ALJ accorded "great weight" to Dr. Mather's opinions, based on Dr. Mather's examination of Claimant, the doctor's use of objective evidence and detailed notes to support his conclusions, and his knowledge and familiarity with agency rules and procedures.  (*Id.*)  The ALJ assigned "more weight" to Dr. Joseph's conclusions that Claimant demonstrated no cognitive impairment despite his MMSE score, and that Claimant appeared to be prone to exaggeration of some symptoms and minimization of others.  (*Id.* at 29)  The ALJ, however, accorded "little weight" to Dr. Joseph's opinions regarding Claimant's limitations in maintaining attention and concentration, and in social interaction.  (*Id.*)  The ALJ explained that this lessened weight was because Dr. Joseph's conclusions about Claimant's ability to pay attention, concentrate, and interact well with others was due to Claimant's irritable mood, and the record included ample evidence that Claimant had presented as cooperative and engaged at other times, including Claimant's own testimony about his ability to interact well with others.  (*Id.*)

The ALJ assigned "little weight" to the opinions of Dr. Riley on Claimant's mental impairments.  (*Id.*)  The ALJ noted that Dr. Riley was not a mental health specialist, but rather a family medicine practitioner.  (*Id.*)  The ALJ also found Dr. Riley's conclusions to be inconsistent with his contemporaneous treatment notes, as well as with the doctor's statement about Claimant just being angry with his supervisor, and his assessment that Claimant was able to return to work.  (*Id.*)

A "severe" impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities."

20 C.F.R. § 404.1520(c). The "ability to do basic work activities," is defined as "the abilities and aptitudes necessary to do most jobs." 20 C.F.R. § 404.1521(b). "An impairment is not severe if it is merely 'a slight abnormality (or combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.'" *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005) (quoting S.S.R. 96-3p). At Step 2 of the sequential evaluation, the "inquiry is a de minimis screening device to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 153-54 (1987)). Its purpose "is to do no more than allow the [Commissioner] to deny benefits summarily to those applicants with impairments of a minimal nature which could never prevent a person from working." *Titles II & XVI: Med. Impairments That Are Not Severe*, SSR 85-28 (S.S.A. 1985) (internal quotation omitted). "[A]n ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb*, 433 F.3d at 687 (quoting S.S.R. 85-28).

In *Young v. Colvin*, Judge David Campbell of this Court addressed the competing standards discussed by the Ninth Circuit in *Webb v. Barnhart* applicable to a Step 2 analysis of whether an impairment is "severe." *Young v. Colvin*, No. CV-16-02264-PHX-DGC, 2017 WL 677167, at **2-4 (D. Ariz. Feb. 2, 2017) (citing *Webb*, 433 F.3d at 686-687). Judge Campbell considered the confusion engendered in a Step 2 analysis under *Webb*, where the Ninth Circuit instructed that courts should apply "normal standard of review to the requirements of step two," and "determine whether the ALJ had substantial evidence to find that the medical evidence clearly established that [the claimant] did not have an impairment or combination of impairments." *Id.* Judge Campbell further explained:

> As mentioned in the standards set forth above, substantial evidence is "less than a preponderance." *Orn*[*v. Astrue*], 495 F.3d [625[,] 630 [9th Cir. 2007]. The reviewing court need not be persuaded by a preponderance of the evidence that the ALJ's decision is correct, but must find only "relevant evidence that a reasonable person might accept as adequate to support a conclusion considering the record as a whole." *Id.* It is not uncommon to

find objective medical evidence in a social security record that supports both parties' positions, and yet the reviewing court is to affirm the ALJ's judgment if there is substantial evidence supporting it. In other words, the existence of contrary evidence is *not* a basis for rejecting an ALJ's decision when substantial evidence supports it. Indeed, "[w]here the evidence is susceptible to more than one rational interpretation, one of which supports the ALJ's decision, the ALJ's conclusion must be upheld." *Thomas v. Barnhart*, 278 F3d. 947, 954 (9th Cir. 2002) (citations omitted).

How, then, does one apply this test in light of the instruction that step two is a mere "de minimis" threshold—that a finding of non-severity at step two must be "clearly established by medical evidence"? *Webb*, 433 F.3d at 687. Is the reviewing court asking whether there is substantial evidence to support the ALJ's finding that non-severity at step two is "clearly established"? Or is the reviewing court asking whether there is evidence in the record that clears the de minimis threshold? If the former, then an ALJ decision supported by substantial evidence would be affirmed even if there was objective evidence in the record suggesting that the disability is more than de minimis. If the latter, the ALJ's decision would be reversed if evidence in the record clears the de minimis threshold, even if the ALJ had substantial evidence for finding that non-severity was "clearly established." *Id.*

*Id.* at *2-3. Judge Campbell noted that the Ninth Circuit in *Webb* found that the "existence of objective medical evidence of a serious impairment was enough to clear the de minimis threshold and result in reversal of the ALJ's decision." *Id.* at *3. Judge Campbell concluded that "the most important portion of *Webb*'s teaching is that the standard at step-two is de minimis[,]" and that "the holding of *Webb*, as opposed to its statement of the standard, requires the Court to reverse if objective evidence suggests that Plaintiff's impairments are more than de minimis." *Id.* at *4. In *Young*, Judge Campbell found objective evidence existed to suggest that the claimant's impairments were more than de minimis. *Id.* Judge Campbell's insightful analysis applies equally to this matter.

Under *Webb*, an impairment will be considered severe for the purposes of a Step 2 evaluation if it is more than a slight abnormality (or combination of slight abnormalities) that has more than a minimal effect on the ability to do basic work activities. *See Webb v. Barnhart*, 433 F.3d at 686. In Claimant's case, there is objective evidence that his

mental impairments were greater than a slight abnormality and that his impairments caused more than minimal effects of his ability to conduct basic work activities. For example, the non-examining evaluator on reconsideration by the state agency, Dr. Daugherty, applied the psychiatric review technique to Claimant's medical records and found that Claimant's mental impairments resulted in mild restriction of activities of daily living, and moderate difficulties in maintaining social functioning, and concentration, persistence or pace. (Doc. 18-4 at 41-42) In completing a Mental RFC Assessment, Dr. Daugherty found Claimant subject to moderate limitations in the functional areas of concentration and persistence, social interaction, and adaptation. (*Id.* at 45-46)

Although at one point treating physician Dr. Riley suggested that Claimant was not disabled, he nevertheless diagnosed Claimant as suffering from major depressive disorder, generalized anxiety disorder, obsessive compulsive disorder, and panic. (Doc. 18-8 at 7) Dr. Riley further found that Claimant had "no ability" to deal with people, only "minimal ability" to be consistent and reliable, and "moderate ability" to work under specific instructions. (*Id.* at 8) Dr. Mather diagnosed Claimant with dysthymic disorder and generalized anxiety disorder, and concluded that Claimant may require additional testing to determine his "true levels of neurocognitive functioning," with "measures of malingering." (*Id.* at 66) Consultative examining physician Dr. Joseph opined that Claimant experienced "genuine mood disturbance," and would likely have difficulty remembering detailed instruction, maintaining concentration and attention to work-related tasks. (*Id.* at 76) Dr. Joseph also concluded that Claimant would be apt to struggle with social interaction and become "irritable and oppositional." (*Id.*)

Because the evidence suggests that Claimant's mental impairments were more than de minimis in degree, it was error for the ALJ to fail to include Claimant's diagnosed mental impairments as severe impairments at Step 2 of the sequential evaluation.

### C. Whether the ALJ erred by not discussing Claimant's positive work history

Claimant asserts that agency policy requires consideration of "evidence of attempts to work" as a component of the ALJ's credibility assessment, and that the ALJ's failure to "acknowledge and discuss" Claimant's positive work history requires remand. (Doc. 22 at 22-24) The Court is unable to find Ninth Circuit authority for this argument. Clearly, 20 C.F.R. §§ 404.1529(c) and 416.929(c) require consideration of a claimant's prior work record, but this authority does not mandate that the decision include a discussion of this consideration. "Although the ALJ must consider a broad spectrum of evidence, including prior work record, an ALJ is not required to include a discussion of a claimant's work history in his or her determination." *Gill v. Astrue*, 2011 WL 6826728, at *5 (S.D. Cal. Dec. 28, 2011); *see also Ferguson v. Berryhill*, 2017 WL 2927148, at *5 (listing cases from U.S. District Courts in California that addressed arguments similar to Claimant's argument here), and *Lamberson v. Astrue*, 2012 WL 4494813, at *5 (C.D. Cal. Sept. 28, 2012) ("Even if Plaintiff's work history is commendable, Plaintiff has not cited any case law that requires an ALJ to elevate work history to a dispositive factor, or to discuss it in his ruling if it is not necessary to do so.").

The ALJ averred that in making his finding on Claimant's RFC, he had considered:

> all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSRs 96-4p and 96-7p. The undersigned has also considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and 416.927 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

(Doc. 18-3 at 31)

The requirement Claimant urges the Court to recognize has not been recognized in the Ninth Circuit, and the ALJ in this case did not err by omitting from his decision a discussion of Claimant's positive work history.

## VII. CONCLUSION

Because the ALJ erred at Step 2 of the sequential evaluation, the decision of the Commissioner will be reversed, and this matter will be remanded to the Commissioner.

Accordingly,

**IT IS ORDERED** that the final decision of the Commissioner of Social Security is **REVERSED** and this matter is **REMANDED** to the Commissioner for further proceedings consistent with this Order.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment accordingly.

Dated this 1st day of November, 2017.

David K. Duncan
United States Magistrate Judge

*Magistrate Judge Duncan signing for Magistrate Judge Fine